# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>IAB MARKETING ASSOCIATES, LP, also d/b/a IAB;<br>INDEPENDENT ASSOCIATION OF BUSINESSES, also d/b/a IAB;<br>HEALTHCORP INTERNATIONAL, INC., also d/b/a IAB;<br>JW MARKETING DESIGNS, LLC, also d/b/a IAB;<br>INTERNATIONAL MARKETING AGENCIES, LP, also d/b/a IAB;<br>INTERNATIONAL MARKETING MANAGEMENT, LLC also d/b/a IAB;<br>WOOD, LLC, also d/b/a IAB;<br>HEALTH SERVICE PROVIDERS, INC.;<br>MAGNOLIA HEALTH MANAGEMENT CORPORATION, also d/b/a Health Service Providers;<br>MAGNOLIA TECHNOLOGIES CORPORATION, also d/b/a Health Service Providers;<br>FAV MARKETING, INC., also d/b/a Health Service Providers;<br>JAMES C. WOOD;<br>JAMES J. WOOD;<br>MICHAEL J. WOOD;<br>GARY D. WOOD;<br>ROY D. HAMILTON; and<br>JUDY M. HAMILTON,<br><br>Defendants. | **Case No.** _____<br><br>**Filed Under Seal**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint against Defendants

IAB Marketing Associates, LP also d/b/a IAB; Independent Association of Businesses also d/b/a

IAB; HealthCorp International, Inc. also d/b/a IAB; JW Marketing Designs, LLC also d/b/a IAB;

International Marketing Agencies, LP also d/b/a IAB; International Marketing Management, LLC also d/b/a IAB; Wood, LLC also d/b/a IAB; Health Service Providers, Inc.; Magnolia Health Management Corporation also d/b/a Health Service Providers; Magnolia Technologies Corporation also d/b/a Health Service Providers; and Fav Marketing, Inc. also d/b/a Health Service Providers; James C. Wood; James J. Wood; Michael J. Wood; Gary D. Wood; Roy D. Hamilton; and Judy M. Hamilton (collectively, "Defendants") alleges:

1.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

## SUMMARY OF THE CASE

2.     This case concerns Defendants' telemarketing scheme that preys on vulnerable consumers, including the unemployed, the uninsured, and those with pre-existing health conditions. Defendants offer to sell consumers major or traditional health insurance, or the equivalent of such insurance. They claim that their healthcare plan provides comprehensive coverage and is available to all, including those with pre-existing health conditions. Based on such representations, consumers pay Defendants an upfront fee ranging from approximately $50 to several hundred dollars, and a monthly payment ranging from approximately $40 to $1000. Rather than providing consumers with the promised health insurance, however, Defendants enroll them in an obscure "trade association" that provides certain limited healthcare related

benefits.  Defendants' scheme has left thousands of consumers without health insurance, while bilking millions of dollars from such consumers.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b).

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFF

5.     Plaintiff, the FTC, is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act.  15 U.S.C. § 6102.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, which prohibits deceptive and abusive telemarketing acts or practices.  The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), 6105(b).

## DEFENDANTS

6.     As detailed below, this case involves two groups of corporate defendants, the IAB Defendants and the HSP Defendants, as well as the respective control persons of each group. The IAB Defendants are the seller of the purported health insurance (the "IAB Membership" or

the "Plan") at issue, while the HSP Defendants are currently the IAB Defendants' largest telemarketer.

### The IAB Defendants/Common Enterprise

7.     Working as a single enterprise from their shared office at 701 Highlander Blvd., Suite 500, Arlington, Texas 76015 (the "IAB Office"), the IAB Defendants have been at the center of the deceptive scheme alleged in this Complaint.

8.     Defendant IAB Marketing Associates, LP ("IAB Marketing"), also doing business as IAB, is registered as a Nevada limited partnership.  IAB Marketing is responsible for, among other functions, contracting with – and supervising – the various telemarketing companies that market the Plan, including the HSP Defendants.  It transacts or has transacted business in this District and throughout the United States.

9.     Defendant Independent Association of Businesses ("IAB Association"), also doing business as IAB, is the front of the scheme and the official seller of the IAB Membership. It is organized under District of Columbia law as a nonprofit corporation with a corporate address at 1747 Pennsylvania Avenue NW, Suite 1000, Washington, DC 20006.  On its website (www.iabbenefits.com/about.html), IAB Association claims to "maintain[] a corporate office on Pennsylvania Avenue at the center of the nation's capitol [sic]."  IAB Association, however, has no Washington, DC office.  (The address it provides belongs to the law firm of Webster Chamberlain & Bean, LLP.)  Instead, IAB Association conducts its operations at the IAB Office in Arlington, Texas, where it shares office space and business with all the other IAB Defendants.

10.     Notwithstanding its "official" nonprofit status, IAB Association is organized to carry on business for the profit of:  (1) its associates – telemarketers who sell the association memberships at issue in this matter; and (2) the other defendants.  Indeed, IAB Association is

engaged in little activity other than selling the Plan; and the business of selling and

administrating the Plan is conducted by the for-profit IAB Defendants, all of which are owned

and controlled by defendant James C. Wood and members of his family. Thus, IAB Association

is subject to the jurisdiction of the FTC pursuant to Section 4 of the FTC Act, 15 U.S.C. § 44.

11.     Defendant IAB Association has changed its name several times since its founding

by Defendant James C. Wood in 1982. Previous permutations included International Association

of Benefits, International Association of Businesses, and the Family Security Coalition. IAB

Association transacts or has transacted business in this District and throughout the United States.

12.     Defendant HealthCorp International, Inc. ("HealthCorp"), also doing business as

IAB, is a Texas corporation. Its involvement in the scheme includes, among other functions,

facilitating financial transactions between the IAB Defendants and consumers who are enrolled

in the Plan. It transacts or has transacted business in this District and throughout the United

States.

13.     Defendant International Marketing Agencies, LP ("International Marketing"),

also doing business as IAB, is a Delaware limited partnership. Its involvement in the scheme

includes, among other functions, providing telecommunications hardware to telemarketing

companies that market the Plan. It transacts or has transacted business in this District and

throughout the United States.

14.     Defendant JW Marketing Design, LLC ("JW Marketing"), also doing business as

IAB, is a Nevada limited liability company. JW Marketing is the sole general partner or

manager of IAB Marketing and functions as a holding company for IAB Marketing. It transacts

or has transacted business in this District and throughout the United States.

15.     Defendant International Marketing Management, LLC ("International Management"), also doing business as IAB, is a Texas limited liability company.  International Management is the sole general partner or manager of International Marketing and functions as a holding company for International Marketing.  It transacts or has transacted business in this District and throughout the United States.

16.     Defendant Wood, LLC, also doing business as IAB, is a Nevada limited liability company that holds profits generated by the scheme for the benefit of individual defendants, including James C. Wood.  It transacts or has transacted business in this District and throughout the United States.

17.     The IAB Defendants have operated as a common enterprise while engaging in the acts and practices alleged in this Complaint.  The IAB Defendants are interrelated and have common control, leadership, employees, office location, advertising, logos and letterheads, and business functions.  Because the IAB Defendants have operated as a common enterprise, each of them is jointly and severally liable for all the unlawful practices of the IAB Defendants alleged in this Complaint.

**The Individual IAB Defendants**

18.     The IAB Defendants are controlled by Defendant James C. Wood, his sons Defendants James J. Wood and Michael J. Wood, and his brother Defendant Gary D. Wood.

19.     Defendant James C. Wood is the founder and the owner, directly or indirectly, of the IAB Defendants.  James C. Wood also is, or was, an officer of IAB Marketing, HealthCorp, International Marketing, JW Marketing, International Management, and Wood, LLC.  James C. Wood is the sole general partner of JW Marketing, and thus, the sole general partner of IAB Marketing.  He is the president of Wood, LLC, International Management, and HealthCorp.  As

6

the president and owner of International Management, James C. Wood is also the sole general partner of International Marketing.  James C. Wood has orchestrated much of the IAB Defendants' business activities, including but not limited to establishing telemarketing plans and campaigns, entering into relevant contracts, training telemarketers, and supervising sales practices.  James C. Wood resides in the Dallas, Texas metro area and in Lake Tahoe, Nevada, and in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, James C. Wood has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the IAB Defendants, including the acts and practices set forth in this Complaint.

20.     Defendant James J. Wood is, or was, an officer of IAB Marketing, and has orchestrated much of its business activities, including but not limited to communicating with telemarketers, entering into relevant contracts, and managing the IAB Defendants' finances. James J. Wood resides in Lake Tahoe, Nevada, and in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, James J. Wood has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the IAB Defendants, including the acts and practices set forth in this Complaint.

21.     Defendant Michael J. Wood is, or was, the president of IAB Marketing, and has orchestrated much of the IAB Defendants' business activities, including but not limited to managing the marketing and sales operations, approving association benefits sold by telemarketers, approving telemarketing scripts, and supervising sales practices.  Michael J. Wood resides in Southlake, Texas and, in connection with the matters alleged herein, transacts or has

transacted business in this District and throughout the United States. At all times material to this

Complaint, acting alone or in concert with others, Michael J. Wood has formulated, directed,

controlled, had the authority to control, or participated in the acts and practices of the IAB

Defendants, including the acts and practices set forth in this Complaint.

22.     Defendant Gary D. Wood is, or was, a vice president of IAB Marketing, and has

orchestrated much of the IAB Defendants' business activities, including but not limited to

establishing telemarketing plans, training telemarketers, supervising sales practices, and handling

consumer complaints. Gary D. Wood resides in Arlington, Texas and, in connection with the

matters alleged herein, transacts or has transacted business in this District and throughout the

United States. At all times material to this Complaint, acting alone or in concert with others,

Gary D. Wood has formulated, directed, controlled, had the authority to control, or participated

in the acts and practices of the IAB Defendants, including the acts and practices set forth in this

Complaint.

<strong>The HSP Defendants/Common Enterprise</strong>

23.     Working as a single enterprise from their shared office at 1500 W. Cypress Creek

Road, Suites 416, 417, and 418, Fort Lauderdale, FL 33309, the HSP Defendants have been a

key telemarketer for the IAB Defendants. The HSP Defendants are currently the largest

telemarketer of the Plan, and are involved in numerous deceptive and unlawful calls with

consumers across the country.

24.     Defendant Health Service Providers, Inc. ("HSP") is organized under Florida law

as a nonprofit corporation. Notwithstanding its "official" nonprofit status, HSP is organized to

carry on business for the profit of the other defendants, specifically defendants Roy Hamilton

and Judy Hamilton. Indeed, HSP is engaged in little activity other than marketing association

8

memberships; and the business of marketing these memberships is conducted by the for-profit HSP Defendants, all of which are owned and controlled by the Hamiltons.  Thus, HSP is subject to the jurisdiction of the FTC pursuant to Section 4 of the FTC Act, 15 U.S.C. § 44.  HSP transacts or has transacted business in this District and throughout the United States.

25.     Defendant Magnolia Health Management Corporation, also doing business as HSP, is a Florida corporation.  It transacts or has transacted business in this District and throughout the United States.

26.     Defendant Magnolia Technologies Corporation, also doing business as HSP, is a Florida corporation.  It transacts or has transacted business in this District and throughout the United States.

27.     Defendant Fav Marketing, Inc., also doing business as HSP, is a Florida corporation.  It transacts or has transacted business in this District and throughout the United States.

28.     The HSP Defendants have operated as a common enterprise while engaging, as a telemarketer, in the acts and practices alleged in this Complaint.  They have conducted the business practices described below through interrelated companies that have common control, leadership, employees, office location, advertising, logos and letterheads, and business functions. Because the HSP Defendants have operated as a common enterprise, each of them is jointly and severally liable for all the unlawful practices of the HSP Defendants alleged in this Complaint.

### The Individual HSP Defendants

29.     The HSP Defendants are controlled by Roy D. Hamilton and his wife Judy M. Hamilton.

30.     Defendant Roy D. Hamilton is the founder, owner, and an officer of the HSP Defendants.  Roy D. Hamilton has orchestrated much of the HSP Defendants' business activities, including but not limited to establishing telemarketing plans and campaigns, entering into relevant contracts, training telemarketers, and supervising sales practices.  He resides in Coral Springs, Florida, and in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Roy D. Hamilton has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the HSP Defendants, including the acts and practices set forth in this Complaint.

31.     Defendant Judy M. Hamilton is an officer and manager of the HSP Defendants.  She has orchestrated much of the HSP Defendants' business activities, including but not limited to establishing telemarketing plans and campaigns, entering into relevant contracts, training telemarketers, supervising sales practices, and responding to consumer complaints.  She resides in Coral Springs with her husband defendant Roy D. Hamilton, and in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Judy M. Hamilton has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the HSP Defendants, including the acts and practices set forth in this Complaint.

## COMMERCE

32.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

33.    Defendants offer to sell consumers major or traditional health insurance, or the equivalent of such insurance, that provides comprehensive coverage and is available to all, including those with pre-existing health conditions.  Rather than providing consumers with health insurance, however, Defendants enroll them in a costly membership to an obscure "trade association" – *i.e.,* the IAB Membership or Plan.

34.    The IAB Membership includes purported discounts and products from third party providers that the IAB Defendants bundle together, such as roadside assistance, travel services, identity-theft protection, and purported discounts on certain health services.  The IAB Membership often also includes some type of insurance benefits, such as limited hospitalization and disability insurance.

35.    As the IAB Defendants sometimes concede in the fine-print of the voluminous written materials they typically send to consumers whom IAB Defendants' telemarketers enrolled into the Plan, the IAB Membership is nothing akin to major or traditional health insurance.  Indeed, as described further below, consumers have been unable to use the IAB Membership for services typically covered by major or traditional health insurance plans.

36.    Since at least 2007, the IAB Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of IAB Memberships by use of telephones, involving millions of interstate telephone calls.  The IAB Defendants have been

using various telemarketers across the country, including the HSP Defendants – which have been part of the scheme alleged in this Complaint since at least 2009.

37.     The IAB Defendants typically handle the billing of consumers who their telemarketers, including the HSP Defendants, enroll into the Plan.  Customer service relating to such consumers is handled by both the IAB Defendants and their telemarketers, including the HSP Defendants.  The consumers often cannot, and do not, differentiate between the IAB Defendants and their telemarketers as sales and customer service agents for both the IAB Defendants and their telemarketers often present themselves to consumers as being part of IAB.

38.     Among other things, the IAB Defendants provide telemarketers of the Plan, including the HSP Defendants, the following:  (1) consumers' contact information; (2) telephone lines and automatic dialing services; (3) telemarketing and customer service scripts; and (4) a commission for each consumer that the telemarketer enrolls into the Plan.

39.     The telemarketing sales scheme alleged in the Complaint makes the IAB Defendants, collectively, a "seller" under TSR, 16 C.F.R. § 310.2(aa), and the HSP Defendants, collectively, a "telemarketer" under TSR, 16 C.F.R. § 310.2(cc).

**Defendants Target Consumers Searching for Health Insurance**

40.     Defendants prey on consumers searching for health insurance.  These consumers often submit their contact information to insurance search websites (such as insureme.com) that offer to provide consumers with information about health insurance plans.

41.     The consumers typically provide their contact information to the websites with the expectation of obtaining information on traditional or major health insurance plans. Traditional or major health insurance plans generally involve an arrangement between an insurance company and a consumer in which the company agrees to pay a substantial portion of

the healthcare expenses that the consumer might incur in exchange for premium payments from the consumer.

42.     Telemarketers of the Plan, including the HSP Defendants, purchase consumer leads from the operators of websites such as those described in Paragraph 41, above, or through the IAB Defendants.  Some telemarketers, including the HSP Defendants, also operate their own lead generating websites.

43.     Many of the consumers to whom telemarketers, including the HSP Defendants, pitch the Plan do not have health insurance, or pay very high premiums for their health insurance, because they have lost their jobs, are approaching retirement age, or have been diagnosed with pre-existing medical conditions.

**The IAB Defendants' Telemarketers Make Material Misrepresentations to Induce Consumers to Purchase the Plan**

44.     The IAB Defendants' telemarketers, including the HSP Defendants, typically state to the consumers that the call is in response to the consumers' requests for information on health coverage.  They ask the consumers for personal background information, such as age, occupation, whether the consumers have health insurance, and if they do not have insurance, the type of insurance they are looking for.

45.     The telemarketers state that the Plan is available immediately even to people with pre-existing medical conditions.  They claim that for a one-time enrollment fee ranging from approximately $50 to several hundred dollars, and a monthly payment ranging from approximately $40 to $1000, consumers will receive an affordable plan that provides comprehensive medical coverage.  For example, a recent telemarketing sales pitch by HSP included the following representations:

[T]here are no waiting periods for pre-existing conditions or physical or medical exam, that's not necessary for a plan that guarantees your benefits and prices, no matter what your pre-existing are.

The only thing this plan will not do … – three things[:] Plastic o[r] cosmetic surgery, fertility treatments for childbirth and lap band surgery for weight loss, unless your doctor deems it medically necessary. But aside from that, everything else – all the other meds, MRIs, mammograms, pap smears, lab work, CAT – you name it, this is a complete health care plan. That's why precisely they're sold first come, first served … if these were always available, why would anyone need Blue Cross and Blue Shield or Aetna? … Anything you can think of on this earth is included on this plan, except for the three things I mentioned to you.

It's a PPO plan. . . . which means you can pick and choose your own doctors. You do not need referrals to see your specialists. That's very important. . . . It's not an HMO because an HM – yeah, an HMO, problematic. Doctors will tell you they prefer PPOs any time over HMOs.

It's a universal plan … It doesn't restrict you from using it anywhere in the country.

46.     On numerous occasions, telemarketers of the Plan, including the HSP Defendants, have referred to the monthly payments consumers must make as "premiums," or included other insurance terms of art in their sales pitches, such as "co-pay," "deductible," "coverage," and "pre-existing condition."

47.     Telemarketers of the Plan, including the HSP Defendants, often pressure consumers to purchase the Plan immediately, stating – typically falsely – that it is available for a limited time only or that only a few slots are still available in the consumers' states.

48.     In recent instances, the HSP Defendants have falsely stated in sales pitches that the Plan is affiliated with state sanctioned healthcare programs or that it is a qualified health insurance plan under the Patient Protection and Affordable Care Act (Pub. L. 111−148, 124 Stat. 119, H.R. 3590).

49.     In some instances, telemarketers of the Plan have misrepresented, directly or by implication, that public figures, such as former Vice President Dick Cheney or former Speaker of the House of Representative Dennis Hastert, endorse or "recognize" the Plan.  For example, numerous websites of the IAB Defendants or their telemarketers reference Mr. Cheney or Mr. Hastert in connection with the Plan.

50.     Telemarketers of the Plan, including the HSP Defendants, often tell consumers that the Plan is widely accepted by doctors in the consumers' geographical areas or that it is accepted by virtually all, or the vast majority of, doctors in the country.  But when consumers look for a provider, after purchasing the Plan, many of the providers that Defendants list are no longer in business, do not accept the Plan, do not accept new patients, or are otherwise unavailable to the consumers.

51.     In some instances, telemarketers have encouraged insured consumers to drop their major or traditional health insurance and replace it with the Plan, promising such consumers that they would pay less for similar or better coverage.

52.     If consumers ask for written information about the Plan before buying it, the telemarketers, including the HSP Defendants, often state that they cannot provide such information, citing various bogus reasons, such as "we cannot do it due to our nonprofit status."

53.     Once consumers express interest in buying the Plan – believing it to be, based on the telemarketers' misrepresentations, major or traditional health insurance or the equivalent of such insurance – the telemarketers, including the HSP Defendants, arrange for payment for the Plan by asking for the consumers' bank account or credit card information.  The telemarketers also guide the consumers through a verification process that consists of a series of recorded yes-or-no questions purportedly to confirm that the consumers are interested in purchasing the Plan.

54.     In some instances, telemarketers of the Plan, including the HSP Defendants, have instructed consumers to answer "yes" to all of the questions posed during the verification recording. Further, when some consumers have asked whether they were purchasing something other than health insurance, telemarketers, including the HSP Defendants, have assured such consumers that they were in fact purchasing a health insurance plan or the equivalent of such a plan. Following completion of the verification questions, the telemarketers tell consumers that they will receive information about the Plan in the mail or via email.

55.     In many instances, telemarketers of the Plan fail to disclose to consumers, in a clear and conspicuous manner, the true identity of the seller of the Plan (*i.e.,* the IAB Defendants).

56.     In numerous instances, the telemarketers, including the HSP Defendants, fail to disclose to consumers, in a clear and conspicuous manner, that rather than buying health insurance, consumers are buying a membership in an association and that a significant portion of the monthly fee that consumers believe is for their health plan is, in fact, a membership fee to IAB Association.

57.     In instances in which the telemarketers, including the HSP Defendants, tell the consumers that the seller of the Plan is IAB Association, they often flaunt its official nonprofit status, suggesting – explicitly or implicitly – that the nonprofit status constitutes a testament of the quality of the Plan or that it allows IAB Association to offer medical coverage that is as comprehensive as, but much cheaper than, the major medical plans offered by the nation's major health insurance companies.

58.     The telemarketers, including the HSP Defendants, fail to disclose to consumers that IAB Association is, in fact, a profit generating enterprise that operates for the benefit of the

Individual IAB Defendants and the telemarketers who market the Plan, including the HSP
Defendants.

59.     After the IAB Defendants obtain the consumers' billing information, they charge
the consumers' bank accounts or credit cards and typically send the consumers written
information about the Plan. The IAB Defendants pay their telemarketers, including the HSP
Defendants, a portion of the upfront and recurring fees that they receive from consumers whom
the telemarketers enroll into the Plan.

60.     In contrast with their telemarketers' oral representations, the written information
about the Plan that the IAB Defendants send to consumers, post-enrollment, typically includes
language stating that the Plan is not health insurance. A careful read of these written materials
reveals that the Plan merely purports to provide consumers with access to certain pre-negotiated
discounts on healthcare and non-healthcare-related services, sometimes coupled with limited
insurance benefits, such as partial reimbursement for certain doctor visits and certain hospital
confinements.

61.     Consumers have been unable to use the Plan for services typically covered by
major or traditional health insurance plans. For example, a telemarketer of the Plan told a retired
consumer that the Plan offered better and cheaper coverage than the major health insurance
policy that covered the consumer and her retired husband. After the consumer switched from her
major health insurance to the Plan, her husband was diagnosed with aggressive cancer and died
within four months. In addition to her terrible loss, the retired consumer also was left with
enormous medical bills that the IAB Defendants would not cover, harassing and humiliating calls
from debt collectors, and a critical blow to the consumer's credit score.

62.      Consumers who have attempted to use the Plan in pharmacies to purchase medication often learned that the discounts available under the Plan were either smaller than the discounts the IAB Defendants' telemarketers promised or were non-existent.

**Telemarketers of the Plan Have Placed Abusive Calls to Consumers**

63.      Since 2003, the FTC has operated a national do-not-call registry (the "Do Not Call Registry") of the telephone numbers of consumers who do not wish to receive certain types of telemarketing calls. *See* 16 C.F.R. 310.4(b)(1)(iii). The TSR prohibits sellers and telemarketers from calling consumers who register their telephone number on the Do Not Call Registry, with certain narrow exceptions that are irrelevant here.

64.      Since at least 2007, in connection with the marketing of IAB Memberships, telemarketers of the Plan, including the HSP Defendants, have placed hundreds of thousands calls to consumers who have their telephone numbers listed on the Do Not Call Registry.  In addition, telemarketers of the Plan, including the HSP Defendants, have called telephone numbers in various area codes without the IAB Defendants or the telemarketers first paying the required annual fee for access to the telephone numbers within such area codes that are included in the Do Not Call Registry.

65.      Since at least 2007, in connection with the marketing of IAB Memberships, telemarketers of the Plan, including the HSP Defendants, have initiated numerous outbound calls to consumers in which they failed to disclose to the consumers, in a clear and conspicuous manner:  (1) the seller's identity (*i.e.,* the IAB Defendants); or (2) that the telemarketers were calling to sell association memberships.

66.      Since at least 2009, in connection with the marketing of IAB Memberships, telemarketers of the Plan, including the HSP Defendants, have initiated numerous outbound calls

18

to consumers in which they failed to promptly connect the consumers who answered the call with a sales representative.

67.     Since September 1, 2009, telemarketers of the Plan have delivered numerous prerecorded messages to consumers who had not previously provided them with an express written agreement authorizing the placement of prerecorded calls to the consumers.

68.     Telemarketers of the Plan, including the HSP Defendants, have also initiated numerous telephone calls to consumers who previously have stated to the telemarketers that they do not wish to receive telephone calls made by or on behalf of the IAB Defendants or their telemarketers.

<strong>Related Prior Law Enforcement Actions</strong>

69.     Multiple law enforcement actions, filed between 2005 and 2010, have made the IAB Defendants aware that their telemarketers are marketing the Plan through deception.

<u>States Enforcement Actions Involving the IAB Defendants</u>

70.     In April 2005, the Attorney General of Texas ("Texas AG") filed a lawsuit alleging that Defendant IAB Association had made numerous unfounded claims in the marketing of its "health care plan" in violation of the Texas Deceptive Trade Practices Act.  The Texas AG further alleged that when consumers attempted to use IAB Association's "discount cards," their medical providers told them that the cards were of no use.  *See generally State of Texas v. International Association of Benefits, f/k/a International Association of Businesses, a/k/a IAB*, No. DV-0504134-J (191st Dist. Ct., Dallas 2006).

71.     On August 2, 2006, a Texas court entered a stipulated final judgment and permanent injunction under which Defendant IAB Association agreed to pay civil penalties and state attorneys' fees, and to make refunds to current or former clients who filed complaints with

19

the Texas AG or the Better Business Bureau about the company's practices. (*See* Final

Judgment, *available at* www.oag.state.tx.us/newspubs/releases/2006/080306ercot_afj.pdf.) The

permanent injunction prohibits IAB Association from, among others: (1) failing to state clearly

and conspicuously in all oral and written communications to consumers that its plans "are not

insurance;" (2) using terms of art from insurance in oral or written communications to consumers

regarding IAB's plans (including but not limited to "pre-existing conditions," "deductible," and

"coverage"); (3) falsely representing that a plan is available for a limited time; and (4) assessing

an enrollment fee unless it is a nominal amount and its material terms and conditions, including

whether it is refundable, are clearly and conspicuously disclosed to consumers. (*See generally*

*id*.)

72.    In April, 2005, the Attorney General of Illinois ("Illinois AG") filed a lawsuit

against Defendants IAB Association and HealthCorp. The allegations in the Illinois AG action

were virtually identical to the allegations in the action brought by the Texas AG. *See People of*

*the State of Illinois v. International Associations of Benefits*, No. 05 CH 06785 (Cook County

Cir. Ct. 2006). The Illinois action resulted in a consent decree with terms similar to the terms in

the Texas stipulated final judgment and permanent injunction. *See* Sep. 14, 2006 Illinois AG

press release, *available at* ww.illinoisattorneygeneral.gov/pressroom/2006_09/20060914b.html.

<u>Recent FTC Enforcement Action Relevant to the IAB Defendants</u>

73.    In August of 2010, the FTC and the State of Tennessee brought an enforcement

action against several Tennessee defendants, including telemarketing company United States

Benefits, LLC ("USB"), charging them with fraudulently marketing bogus medical plans as

major or traditional health insurance. *See FTC and State of Tennessee v. United States Benefits,*

*LLC, et al.*, No. 3:10-0733 (M.D. Tenn.). This action led to the shutdown of USB and a

November 2011 stipulated permanent injunction and monetary judgment against it and two individual defendants. The injunction includes, among other bans, a ban on the marketing and sale of healthcare-related benefits or discount programs and a ban on the marketing and sale of insurance products. (*See* Stipulated Final Order, *available at* ww.ftc.gov/os/caselist/1023084/111107usbenefitsorder.pdf.)

74.     Evidence that the FTC obtained in its action against USB revealed that USB was a key telemarketer for the IAB Defendants, generating millions of dollars for them. Indeed, most of the plans that USB had marketed to consumers through deceptive means were IAB Memberships, or included IAB Memberships.

75.     The IAB Defendants maintained continuous extensive communication with USB and exercised control over USB's telemarketing of IAB Memberships. For example, IAB Defendants maintained approval authority over USB's sales scripts and verification practices. They were involved in the training of USB salespeople, monitored, directly or indirectly, calls by USB, and had authority to instruct USB to fire particular salespeople.

76.     IAB Defendants also provided USB the hardware needed to make automated calls to hundreds of thousands of consumers. This "dialer" was located at the IAB Office and administered by IAB Defendants' full-time employee.

77.     IAB Defendants were, or should have been, aware of USB's deceptive marketing practices. They received such information from numerous sources, including USB, business partners, the Better Business Bureau, regulators from various states, and individual consumers who made detailed complaints. Despite the extensive and continuous stream of evidence of egregious misconduct, IAB Defendants did not terminate their relationships with USB. Instead,

they continued to reap the generous profits that USB produced for them through deceptive telemarketing.

78.     Through their current telemarketers, including the HSP Defendants, IAB Defendants have continued to engage in virtually the same unlawful acts and practices at issue in the Texas, Illinois, and USB actions with respect to numerous consumers across the country.

Recent Enforcement Action Involving a Seller of Bogus Health Plans for which the HSP Defendants were a Key Telemarketer

79.     While acting as a key telemarketer for the IAB Defendants, the HSP Defendants were also a key telemarketer for Consumer Health Benefits Association ("CHBA"), a seller of association memberships such as those at issue in this matter, until CHBA ceased operations in August of 2010 due to an FTC enforcement action. *See FTC v. Consumer Health Benefits Association et al.*, 1:10-cv-03551 (E.D.N.Y).

80.     The FTC charged CHBA with unlawful conduct that is virtually identical to the conduct at issue here.  The temporary restraining order, followed by a preliminary injunction, issued by the Eastern District of New York, closed CHBA's operations, finding that the FTC is likely to prevail on the merits of that action. *See Aug. 3, 2010 Temporary Restraining Order with Asset Freeze, Appointing Temporary Receiver and Other Equitable Relief, available at* http://www.ftc.gov/os/caselist/1023107/100811consumerhealthbenefitstro.pdf.

81.     During the time that the HSP Defendants were a key telemarketer for CHBA, CHBA was also subject to similar actions by, among others, the state attorneys general of Minnesota (*Attorney General, Lori Swanson v. Consumer Benefits Association*, No. 27-cv-09-24134 (4th Jud. Dist. Ct. Hennepin County)), Massachusetts (*Commonwealth of Massachusetts v. Consumer Health Benefits Association et al.*, No. 09-0347F (Sup. Ct. Suffolk County)), and

22

Arkansas (*Dustin McDaniel, Attorney General v. Consumer Health Benefits Association*, No. CV-10-1175 (6th Div. Cir. Ct. Pulaski County)).

## GOVERNING ACTS AND REGULATIONS

### Section 5(a) of the FTC ACT

82.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

83.     Misrepresentations or deceptive omissions of material fact likely to mislead consumers acting reasonably under the circumstances constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### The Telemarketing Act and the TSR

84.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act.  15 U.S.C. § 6102(a).  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.  Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

85.     Several provisions of the TSR are implicated in this case.  First, the TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of the goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).  Likewise, the TSR prohibits sellers and telemarketers from making any false or misleading statements to induce a person to pay for goods or services.  16 C.F.R. § 310.3(a)(4).

86.     Second, the TSR requires telemarketers in an outbound telephone call, including a prerecorded message to induce the purchase of any good or service, to disclose truthfully, promptly, and in a clear and conspicuous manner the following:

          A.  the identity of the seller; and

          B.  the nature of the goods or services

16 C.F.R. § 310.4(d)(1) and (3).

87.     Third, the TSR prohibits sellers and telemarketers from abandoning any outbound telephone call.  Under the TSR, a telephone call is considered abandoned if a person answers it and the telemarketer who initiated the call does not connect the call to a sales representative within two seconds of the person's completed greeting.  16 C.F.R. § 310.4(b)(I)(iv).

88.     Fourth, effective September 1, 2009, the TSR prohibits initiating a telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of that specific seller.  The express agreement must include the recipient's telephone number and signature, must be obtained after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person, and must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.  16 C.F.R. § 310.4(b)(1)(v)(A).

89.     Fifth, the TSR prohibits sellers and telemarketers from initiating outbound calls to consumers who register their telephone number on the Do Not Call Registry.  16 C.F.R. § 310.4(b)(1)(iii)(B).  Under the TSR, an "outbound telephone call" means a telephone call made by a telemarketer to induce the purchase of goods or services or to solicit a charitable

contribution.  16 C.F.R. § 310.2(v).  Consumers can register their telephone numbers on the Do Not Call Registry without charge either through a toll-free telephone call or over the Internet at donotcall.gov.  Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered.

90.     Sixth, the TSR prohibits sellers and telemarketers from initiating an outbound telephone call to any person who previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered.  16 C.F.R. § 310.4(b)(1)(iii)(A).

91.     Finally, the TSR prohibits telemarketers from calling, and sellers from causing a telemarketer to initiate a call to, any telephone number within a given area code, unless the seller on whose behalf the call is made has paid the annual fee for access to the telephone numbers within that area code that are included in the Do Not Call Registry.  16 C.F.R. § 310.8.

## COUNT I

### Deceptive Marketing in Violation of the FTC Act

### (As to All Defendants)

92.     In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, or sale of IAB Memberships, Defendants have represented, directly or indirectly, expressly or by implication, that the IAB Memberships are major or traditional health insurance, or the equivalent of such insurance.

93.     In truth and in fact, IAB Memberships are not major or traditional health insurance, or the equivalent of such insurance.

94.     Therefore, Defendants' representations, as set forth in Paragraph 92, above, are false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Deceptive Telemarketing Calls in Violation of the TSR

### (As to All Defendants)

95.     In numerous instances, in connection with the advertising, telemarketing, promoting, offering for sale, or sale of IAB Memberships, Defendants have misrepresented, directly or indirectly, expressly or by implication, that IAB Memberships are major or traditional health insurance, or the equivalent of such insurance.

96.     Defendants' acts and practices, as described in Paragraph 95, above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(iii) & (a)(4).

## COUNT III

### Failure to Make Oral Disclosures Required by the TSR

### (As to the HSP Defendants and the Individual HSP Defendants Only)

97.     In numerous instances, in the course of advertising, telemarketing, promoting, offering for sale, or sale of IAB Memberships, the HSP Defendants and the Individual HSP Defendants have initiated outbound telephone calls, or caused others to initiate such calls, in which the telemarketer failed to disclose promptly and in a clear and conspicuous manner to the person receiving the call:

    A.  the identity of the seller; or

    B.  the nature of the goods or services.

98.     The HSP Defendants and the Individual HSP Defendants' acts and practices as alleged in Paragraph 97, above, are abusive telemarketing calls in violation of the TSR, 16 C.F.R. § 310.4(d)(1) & (3).

## COUNT IV

### Abandoned Calls in Violation of the TSR

### (As to All Defendants)

99.     In numerous instances, in the course of advertising, telemarketing, promoting, offering for sale, or sale of IAB Memberships, Defendants have abandoned, or caused a telemarketer to abandon, an outbound telephone call by failing to connect the call to a sales representative within two seconds of the completed greeting of the person answering the call.

100.    Defendants' acts and practices as alleged in Paragraph 99, above, are abusive telemarketing calls in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iv).

## COUNT V

### Unauthorized Prerecorded Messages

### (As to the IAB Defendants and the Individual IAB Defendants Only)

101.    In numerous instances on or after September 1, 2009, in the course of advertising, telemarketing, promoting, offering for sale, or sale of IAB Memberships, the IAB Defendants and the Individual IAB Defendants have initiated – or caused a telemarketer, including USB, to initiate – outbound telephone calls that delivered prerecorded messages in violation of the TSR, 16 C.F.R. 310.4(b)(1)(v).

## COUNT VI

### Do Not Call Registry Violations

### (As to All Defendants)

102.    In numerous instances, in connection with the advertising, telemarketing, promoting, offering for sale, or sale of IAB Memberships, Defendants have engaged in, or caused a telemarketer to engage in, initiating an outbound telephone call to a person's telephone number on the Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT VII

### Violations of the Entity-Specific Do-Not-Call Rule

### (As to All Defendants)

103.    In numerous instances, in connection with the advertising, telemarketing, promoting, offering for sale, or sale of IAB Memberships, Defendants have engaged in, or caused a telemarketer to engage in, initiating an outbound telephone call to a person who has previously stated that he or she does not wish to receive such a call made by or on behalf of the IAB Defendants, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).

## COUNT VIII

### Failure to Pay Do Not Call Registry Fees

### (As to All Defendants)

104.    In numerous instances, in connection with telemarketing, Defendants have made, or caused a telemarketer to make, an outbound telephone call to a telephone number within a given area code when Defendants had not, either directly or through another person, paid the required annual fee for access to the telephone numbers within that area code that are included in the Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.8.

## CONSUMER INJURY

105.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their and their telemarketers' unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

106.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

107.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers or other persons resulting from Defendants' violations of the TSR, including the rescission and reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b; Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b); and the Court's own equitable powers, requests that the Court:

A.      Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions, an order freezing Defendants' assets, and financial accounting.

B.      Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint.

C.      Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants.

D.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

E.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Date:  September 18, 2012

Respectfully submitted,

_____
DOTAN WEINMAN
PATRICIA B. HSUE

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW, H-286
Washington, DC  20580
(202) 326-3049, dweinman@ftc.gov (Weinman)
(202) 326-3132, phsue@ftc.gov (Hsue)
(202) 326-3395 (Fax)

*Attorneys for Plaintiff Federal Trade Commission*

30